1

2

3

4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

5

6

EVA A. RAMIREZ,

7                        Plaintiff,        NO. CV-07-3044-EFS

8            v.

9    OLYMPIC HEALTH MANAGEMENT      **ORDER GRANTING AND DENYING IN**
     SYSTEMS, INC., a Washington    **PART DEFENDANT'S MOTION FOR**
10   Corporation,                   **SUMMARY JUDGMENT AND DENYING**
                                    **DEFENDANT'S *DAUBERT* MOTION**
11                       Defendant.

12

13       A hearing occurred in the above-captioned matter on April 15, 2009,

14   in Yakima.  Plaintiff Eva A. Ramirez was represented by Kevan T. Montoya

15   and Tyler M. Hinckley; Robert H. Bernstein appeared on behalf of

16   Defendant Olympic Health Management Systems, Inc.  Before the Court were

17   Plaintiff's Motion for Partial Summary Judgment (Ct. Rec. 141),[1] as well

18   as Defendant's Motion for Summary Judgment (Ct. Rec. 133) and *Daubert*

19   Motion (Ct. Rec. 138).  After reviewing the submitted material, relevant

20   authority, and hearing oral argument, the Court was fully informed and

21   granted and denied in part Defendant's summary judgment motion.  The

22   Court also denies Defendant's *Daubert* motion.[2]  This Order serves to

23   memorialize and supplement the Court's oral rulings.

24   _____

25       [1]This motion is addressed in a separate Order.

26       [2]The Court finds that oral argument on this motion is unnecessary.
     LR 7.1(h)(3).

     ORDER * 1

## I. Background[3]

**A.   Hiring and Company Hierarchy**

Plaintiff Eva Ramirez, who is Hispanic, applied for a sales position with Defendant Olympic Health Management Systems, Inc. on February 3, 2006. (Ct. Rec. 203 at 1.) Defendant sells life and health insurance for Sterling Life Insurance Company. *Id.* Plaintiff was hired and started as a field sales agent with Betty Hill's sales team in the Yakima office on April 20, 2006. *Id.* at 2. Plaintiff's duties consisted of selling various insurance policies to Washington customers - she was paid exclusively on commission. *Id.*

Defendant's relevant corporate hierarchy is as follows: James Benedict was Defendant's regional director; Harriet Ziegler was Defendant's human resources director; Katrina Borth managed Defendant's Tri-Cities, Wenatchee, and Yakima sales offices - she reported to Mr. Benedict; and Betty Hill and Barbara Bloomfield were field sales managers - they reported to Ms. Borth. (Ct. Rec. 136-2 at 6.)

Neither Ms. Hill nor Ms. Bloomfield were Plaintiff's direct supervisors; that is, they did not have the ability to hire and fire Plaintiff. Mses. Hill and Bloomfield did, however, retain supervisory authority over Plaintiff when it came to ensuring compliance with Defendant's sales quotas and anti-discrimination policies. (Ct. Rec. 136-5 at 13.) For example, Plaintiff was instructed to report workplace treatment incidents to either Mses. Hill or Bloomfield.

---

[3]In a motion for summary judgment, the facts are set forth in a light most favorable to the nonmoving party - here, that is Plaintiff. *Leslie v. Grupo ICA,* 198 F.3d 1152, 1158 (9th Cir. 1999).

ORDER * 2

1  (Ct. Rec. 149-3 at 259.)  Mses. Hill and Bloomfield also informed

2  Plaintiff that they could discipline her for office misconduct.

3  (Ct. Rec. 149 at 7.)

4  **B.  Company Policies and Training**

5      Defendant publishes an Employee Handbook.  (Ct. Rec. 203 at 2.)

6  The Handbook sets forth Defendant's "no tolerance" policy regarding

7  workplace harassment and identifies proper workplace behavior in order

8  to maintain a harassment-free working environment.  (Ct. Rec. 136-8 at

9  6.)

10     The Handbook also includes a "Problem Solving Procedure," which

11 identifies the avenues available for reporting workplace discrimination

12 or harassment.  *Id.* at 8.  Plaintiff signed an acknowledgment in

13 February 2006 affirming that she received the Handbook and was

14 responsible for complying with its policies.  (Ct. Rec. 136-2, Ex. 4.)

15     In addition to viewing the Handbook, Plaintiff attended a five-day

16 "new agent training" from April 23-27, 2006, in Bellingham, Washington.

17 (Ct. Rec. 203 at 3.)  At the training, Plaintiff received a copy of

18 Defendant's Code of Business Conduct.  (Ct. Rec. 136-2 at 38.)  In

19 addition to reiterating Defendant's anti-harassment policy, the Code

20 also included contact information for various supervisors as well as an

21 "Ethics Hotline," a toll-free number where employees could ask

22 questions, receive advice, and anonymously report company violations.

23 (Ct. Rec. 136-9, Ex. H.)

24     Despite Defendant's harassment reporting procedures, Plaintiff

25 never submitted any written complaints or called any support numbers

26 regarding improper workplace conduct during her five-month employ.

   (Ct. Rec. 136-13 at 3-5.)

   ORDER * 3

**C.   Alleged Discriminatory Incidents and Remediation Efforts**

 During her five-month employ with Defendant, Plaintiff identified nine (9) allegedly discriminatory incidents:

1) Plaintiff did not receive certain "hot leads," i.e., walk-in or call-in customers who were more likely to purchase insurance, despite being the Yakima office's top sales agent.

2) At the April 2006 new-agent training, Plaintiff's co-worker remarked that Plaintiff was "a conceited, snotty bitch . . . that . . . probably came from migrant workers and [was] probably picking corn yesterday." (Ct. Rec. 136-2 at 32.)

3) In May 2006, Plaintiff requested time off to attend a dinner honoring Mexican President Vincente Fox.  Ms. Bloomfield commented that 1) the event sounded "stupid," 2) Mexico's president should not even be allowed in the United States, and 3) "he should take all the Mexicans that are here back with him." *Id.* at 30.

4) After attending the dinner honoring President Fox, Plaintiff returned to the Yakima office with a floral centerpiece featuring both a Mexican flag and an American flag. Ms. Bloomfield instructed Plaintiff to remove the Mexican flag because "this is America" - Plaintiff declined.  Plaintiff left her desk for a short period and, when she returned, the floral centerpiece was gone.  *Id.* at 23-24.

5) On at least one occasion, Plaintiff showed up late to work and Ms. Bloomfield remarked: "There's proof, see, they [read: Hispanics] are always late." *Id.* at 22.

6)   When Plaintiff was conferring in Spanish to Spanish-speaking customers over the telephone, Ms. Bloomfield interrupted Plaintiff and asked if she was on a personal call. *Id.* at 32.

7)   In June 2006, illegal immigrants staged marches at various locations across the United States regarding immigration and workplace rights. Ms. Bloomfield asked Plaintiff if she was "taking the day off [to march] with the rest of them . . . ." *Id.* at 29.

8)   In August 2006, during a regional insurance conference, Ron West - a field sales manager from another office - commented that "[he could] not wait for that damn wall to be built and for us to throw all those Mexicans out of here." The comment was not directed at Plaintiff. *Id.* at 25.

9)   Ms. Bloomfield allegedly informed Plaintiff that she could not travel to the Harman Center - a retirement center "rich" with leads - because the residents there were elderly Caucasians and would be "offended by her presence." (Ct. Rec. 95 at 3.)

On a few occasions, Plaintiff complained to Ms. Hill about Ms. Bloomfield's improper behavior. Ms. Hill said she would relay the complaints to Ms. Borth, but advised Plaintiff that "she was probably taking things too personally." (Ct. Rec. 149 at 5.) Ms. Hill never reported the incidents.

After Mr. West's Mexican wall comment, Plaintiff informed Ms. Borth that "she'd had it" and was going to file a formal complaint with Defendant's Human Resources Department. Ms. Borth responded by reporting the comment to Harriet Ziegler and, a few days later, setting up a conference call with the regional offices to discuss the incident

ORDER * 5

1  and reinforce Defendant's commitment to a harassment-free workplace.

2  (Ct. Recs. 135 at 8; 136-12 at 31.)

3  **D.    Resignation**

4      In early August 2006, Plaintiff met with Raul Diaz to discuss

5  employment opportunities at Humana, one of Defendant's competitors.  On

6  August 22, 2006, Plaintiff completed and submitted an employment

7  application with Humana.  (Ct. Rec. 203 at 4-5.)

8      On August 29, 2006, Plaintiff informed Ms. Borth that Humana

9  offered her a job.  Plaintiff submitted her two (2) weeks notice to

10  Ms. Borth the following day and formally accepted a position with Humana

11  on September 2, 2006.  *Id.* at 5.  Plaintiff continued working for

12  Defendant until September 11, 2006.

13      Plaintiff was never terminated, demoted, or transferred during her

14  employ with Defendant.  *Id.* at 4.  Plaintiff was also the top

15  salesperson for the Yakima office during each of the five (5) months she

16  worked for Defendant.  (Ct. Rec. 136-2 at 48.)

17      On June 27, 2007, Plaintiff filed the above-captioned matter.  (Ct.

18  Rec. 1.)  After a contentious discovery process, the parties filed the

19  *Daubert* and dispositive motions now before the Court.

20                              **II. Discussion**

21  **A.    Summary Judgment Standard**

22      Summary judgment is appropriate if the "pleadings, depositions,

23  answers to interrogatories, and admissions on file, together with the

24  affidavits, if any, show that there is no genuine issue as to any

25  material fact and that the moving party is entitled to judgment as a

26  matter of law."  FED. R. CIV. P. 56(c).  Once a party has moved for

summary judgment, the opposing party must point to specific facts

ORDER * 6

1   establishing that there is a genuine issue for trial.  *Celotex Corp. v.*
2   *Catrett,* 477 U.S. 317, 324 (1986).  If the nonmoving party fails to make
3   such a showing for any of the elements essential to its case for which
4   it bears the burden of proof, the trial court should grant the summary
5   judgment motion.  *Id.* at 322.  "When the moving party has carried its
6   burden of [showing that it is entitled to judgment as a matter of law],
7   its opponent must do more than show that there is some metaphysical
8   doubt as to material facts.  In the language of [Rule 56], the nonmoving
9   party must come forward with 'specific facts showing that there is a
10  *genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio*
11  *Corp.,* 475 U.S. 574, 586-87 (1986) (citations omitted) (emphasis in
12  original opinion).

13      When considering a motion for summary judgment, a court should not
14  weigh the evidence or assess credibility; instead, "the evidence of the
15  non-movant is to be believed, and all justifiable inferences are to be
16  drawn in his favor."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255
17  (1986).  This does not mean that a court will accept as true assertions
18  made by the non-moving party that are flatly contradicted by the record.
19  *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties
20  tell two different stories, one of which is blatantly contradicted by
21  the record, so that no reasonable jury could believe it, a court should
22  not adopt that version of the facts for purposes of ruling on a motion
23  for summary judgment.").

24  **B.   Defendant's *Daubert* Motion (Ct. Rec. 138)**

25      To help calculate the economic damages attributed to Plaintiff's
26  alleged lost sales leads, Plaintiff retained Lori A. Geddes, Ph.D., an
    expert in welfare economics.  Defendant argues that Dr. Geddes'
    ORDER * 7

testimony should be excluded under Federal Rule of Evidence 702 and *Daubert*[4] because she 1) is not qualified to serve as an expert; 2) did not base her report upon any facts; 3) neglected to utilize sound methodology; 4) will not assist the trier of fact; and 5) will prejudice Olympic's case. (Ct. Rec. 139 at 8.)

Federal Rule of Evidence 702 permits witnesses qualified as experts by "knowledge, skill, experience, training, or education" to testify "in the form of an opinion or otherwise" about "scientific, technical, or other specialized knowledge" if the knowledge will "assist the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702 (2008). The expert's testimony must be "based on sufficient facts or data" and "the product of reliable principles and methods." *Id.* Furthermore, the expert must apply these "principles and methods reliably to the facts of the case." *Id.*

Trial courts must act as "gatekeepers" and decide whether to admit or exclude expert testimony under Rule 702. *Daubert I,* 509 U.S. at 589 (1993); *Dukes v. Wal-Mart, Inc.,* 509 F.3d 1168, 1179 (9th Cir. 2007). This "gatekeeping" function extends to all expert testimony, not just scientific testimony. *White v. Ford Motor Co.,* 312 F.3d 998, 1007 (9th Cir. 2002).

Rule 702 permits a flexible, fact-specific inquiry that embodies the twin concerns of reliability and helpfulness. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150 (1999); *Hemmings v. Tidyman's Inc.,* 285 F.3d 1174 1184 (9th Cir. 2002). The test for reliability "is not the

---

[4]*Daubert v. Merrell Dow Pharm., Inc. ("Daubert I"),* 509 U.S. 579 (1993).

ORDER * 8

correctness of the expert's conclusions but the soundness of his methodology." *Daubert v. Merrell Down Pharm. ("Daubert II"),* 43 F.3d 1311, 1318 (9th Cir. 1995). Testimony that is reliable must nevertheless be helpful. The test for helpfulness is essentially a relevancy inquiry. *Daubert,* 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.") Trial courts may exclude testimony that falls short of achieving either of Rule 702's twin concerns.

### 1. Qualifications

The Court first examines Dr. Geddes' credentials to determine whether she is qualified to render an expert opinion. Dr. Geddes received her Bachelor of Science in Economics, her Masters of Arts in Economics, and her doctoral degree in economics from the University of Wisconsin. (Ct. Rec. 139, Ex. A at 19.) Dr. Geddes' work has focused on economic-related issues since 1993. Her professional experience includes, *inter alia*, working as a principal investigator for the Institute for Public Policy and Economic Analysis at Eastern Washington University and teaching a variety of labor, discrimination, and general economics courses at both the University of Wisconsin and Eastern Washington University. *Id.* at 19-20. Throughout her professional career, Dr. Geddes has consistently employed mathematical economics in order to perform her responsibilities as a researcher and economics professor. (Ct. Rec. 144 at 1-2.) Dr. Geddes has also written several professional articles concerning labor and discrimination economics and has publically presented on various economic topics.

True, Dr. Geddes' research interests and professional works do not specifically address life and health insurance sales, which is

ORDER * 9

Plaintiff's particular employment field. But Dr. Geddes has consistently applied mathematical economics techniques in both labor and discrimination economics. Because the same mathematical economic techniques apply to both insurance sales and welfare economics, the Court finds that Dr. Geddes' extensive credentials give her the education, experience, and knowledge necessary to qualify as an expert under Rule 702.

**2. Reliability**

Defendant argues that Dr. Geddes' report is unreliable because her economic methodology is based on arbitrary assumptions and unsupported economic models. (Ct. Rec. 139 at 5.) Plaintiff responds that Defendant's critique of Dr. Geddes is nothing more than a disagreement with her findings. (Ct. Rec. 143 at 14.)

A trial court not only has broad latitude in determining whether an expert's testimony is reliable, but also in deciding *how* to determine the testimony's reliability. *United States v. Hankey,* 203 F.3d 1160, 1168 (9th Cir. 2000). The Court must "analyze not what the experts say, but what basis they have for saying it." *Daubert II*, 43 F.3d at 1316. So while the Supreme Court did create a factor-based approach for analyzing scientific expert testimony reliability,[5] these factors need

---

[5]These factors are: 1) whether a method can or has been tested; 2) the known or potential rate of error; 3) whether the methods have been subjected to peer review; 4) whether there are standards controlling the technique's operation; and 5) the general acceptance of the method within the relevant scientific community. *Daubert I,* 509 U.S. at 593-94.

ORDER * 10

not apply to every case. *See United States v. Prime,* 431 F.3d 1147 (9th Cir. 2005).

Defendant's specific criticisms of Dr. Geddes' opinions are as follows:

i.    <u>Objective Analysis</u>

Defendant claims that Dr. Geddes' sales-and-lead analysis is based entirely on conversations with Plaintiff. (Ct. Rec. 139 at 7.) Dr. Geddes denies this claim, contending that she relied on the complaint, answer, Sterling Leads Management Program policy handbook, Olympic Commission Statements, U.S. Census Bureau demographic statistics, and depositions of five (5) past or present Olympic employees. (Ct. Rec. 144 at 3-5.) All information disclosed by Defendant was considered before rending an opinion. *Id.* Moreover, Dr. Geddes asserts the information she relied on is information that experts would normally rely on to give opinions regarding projected sales and earnings. (Ct. Rec. 144 at 6.)

ii.    <u>Lead and Sale Loss Calculation</u>

Defendant also challenges Dr. Geddes' opinion that Plaintiff lost seventy-one (71) sales leads, insisting that the number is nothing more than rampant speculation unsupported by scientific basis. (Ct. Rec. 139 at 8-9.) Dr. Geddes responds that she 1) utilized econometric statistical analysis to calculate total lost leads; 2) applied correlation and standard regression analysis to demonstrate that the majority of Plaintiff's leads were from customers with Hispanic sounding surnames; and 3) that leads were disproportionally distributed in violation of Sterling Leads Management Program policy handbook.

iii. <u>Conclusion Basis</u>

Defendant contends that Dr. Geddes' conclusions are improper because she failed to support her estimated number of lost sales leads or the related commission estimate with scientific evidence. (Ct. Rec. 139 at 8-9.) Dr. Geddes counters that she used correlation and standard regression analysis. (Ct. Rec. 144 at 2.)

After considering Defendant's various criticisms, the Court finds that Dr. Geddes' methodologies are reliable and her assumptions are valid and grounded in the present case's facts. Her report and declaration indicate that her assumptions were based on the facts known to her as she prepared her report, in addition to commonly used statistical tools. *See Quinones-Pacheco v. Am. Airlines, Inc.,* 979 F.2d 1, 6 (1st Cir. 1992). While Plaintiff does not cite to treatises or peer-reviewed articles supporting Dr. Geddes' methodologies, the reliability of her conclusions is based on her extensive experience.

Defendant has had ample opportunity to depose Dr. Geddes to gather information on her qualifications and methodologies, but has expressed no interest in doing so. (Ct. Rec. 144 at 7.) Ultimately, Defendant's challenges are appropriately addressed through vigorous cross-examination and presentation of contrary evidence. *See Daubert I,* 509 U.S. at 596.

**3. Helpfulness**

The Ninth Circuit has stated that "[f]ederal judges must . . . exclude proffered scientific evidence under Rules 702 and 403 unless they are convinced that it speaks clearly and directly to an issue in dispute in the case, and that it will not mislead the jury." *Daubert II,* 43 F.3d at 1321 n.17. This means that the expert testimony must

ORDER * 12

1  logically advance a material aspect of the proposing party's case. *Id.*

2  at 1315.

3      Here, Dr. Geddes' testimony will be helpful to the jury because her

4  testimony speaks clearly and directly to the tangible injury Plaintiff

5  suffered due to Defendant's allegedly discriminatory treatment – this

6  helps Plaintiff establish her prima facie case. *See Diaz v. Am. Tel. &*

7  *Tel.*, 752 F.2d 1356, 1363 (9th Cir. 1985) (finding that statistical

8  evidence is one way to establish a prima facie case). Accordingly,

9  Defendant's *Daubert* motion is denied.

10 **C.  Defendant's Motion for Summary Judgment (Ct. Rec. 133)**

11      **1.  Constructive Discharge**

12      Defendant argues that Plaintiff's constructive discharge claim

13 fails because her working conditions were neither intolerable nor

14 egregious. (Ct. Rec. 134 at 11.) Plaintiff insists that Mses. Borth's

15 and Bloomfield's consistently insensitive behavior would compel an

16 objectively reasonable person to resign. (Ct. Rec. 148 at 22.)

17      "[C]onstructive discharge occurs when the working conditions

18 deteriorate, as a result of discrimination, to the point that they

19 become sufficiently extraordinary and egregious to overcome the normal

20 motivation of a competent, diligent, and reasonable employee to remain

21 on the job to earn a living and serve his or her employer." *Brooks v.*

22 *City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000). The test is

23 objective; the plaintiff need not show that the employer subjectively

24 intended to force the employee to resign. *Watson v. Nationwide*, 823

25 F.2d 360, 361 (9th Cir. 1987).

26      A single isolated incident is insufficient as a matter of law to

support a constructive discharge finding. *Wallace v. City of San Diego*,

ORDER * 13

479 F.3d 616, 626 (9th Cir. 2007).  The Ninth Circuit requires more - specifically, "aggravating factors" that demonstrate a continuous pattern of discriminatory treatment over months or years.  *Watson*, 823 F.2d at 361.  "As a result, the answer turns on the facts of each case." *Satterwhite v. Smith*, 744 F.2d 1380, 1382 (9th Cir. 1984).  This high standard is "predicated on the notion that Title VII policies are best served when the parties, if possible, attack discrimination within the context of their existing employment relationships." *Watson*, 823 F.2d at 361.

Even viewing the evidence her favor, Plaintiff's constructive discharge claim cannot survive.  Plaintiff describes the workplace discrimination she experienced as "ubiquitous" and insists she was compelled to resign because there was "little to no hope that [Defendant] would do anything to remedy the situation."  (Ct. Rec. 148 at 21-22.)  Plaintiff's position is belied by the following facts:

First, despite being briefed on Defendant's "no tolerance" policy and the ample avenues for reporting workplace discrimination, Plaintiff never submitted any formal written complaints or called any support numbers regarding Ms. Bloomfield's allegedly improper workplace conduct; instead, Plaintiff informally complained to Ms. Hill.  Plaintiff lodged her first official discrimination complaint with Ms. Borth on August 25, 2006.  Rather than give Defendant an opportunity to investigate the charge and take corrective action, Plaintiff promptly accepted a new employment offer, submitted her two-weeks notice, and emphatically declared, "I'm suing them now . . . ."  (Ct. Rec. 136-2 at 26.)  Such rushed actions are contradictory to Title VII's policy of attacking discrimination within the workplace before resorting to litigation.

ORDER * 14

Second, after Mr. West made the admittedly improper Mexican wall comment and Plaintiff indicated that this upset her, Ms. Borth reacted by immediately contacting Defendant's HR director and arranging a conference with the three (3) regional offices to discuss Mr. West's comment and review Defendant's anti-discrimination policies.  Shortly thereafter, Ms. Ziegler and Ms. Borth personally met with Mr. West to discuss the comments.  Mr. West deeply regretted making the comments and offered to personally apologize to Plaintiff.  Simply put, Ms. Borth's prompt remedial efforts hardly reflect a scenario with "little to no hope of change."  (Ct. Rec. 148 at 21.)

Third, "[i]f an employee wishes to claim that an employer's act should be deemed a constructive discharge, [she] must 'put up or shut up.'" *Wagner v. Sanders Assoc., Inc.*, 638 F. Supp. 742, 745-46 (C.D. Cal. 1996).  That is to say, if an employee claims she had no choice but to leave, "[she] must leave when the choice is posed, not after [she] has afforded [herself] the chance to avoid the unpleasant consequences of leaving."  *Id.*  By Plaintiff's own admission, "she'd had it" after Mr. West's Mexican wall comment at the Spokane conference in August 2006. (Ct. Rec. 136-2 at 25.)  Despite this admission, Plaintiff stayed on for an additional two (2) weeks in these "egregious" working conditions while finalizing arrangements with Humana, her soon-to-be new employer.  In fact, Plaintiff began employment negotiations with Humana weeks before Mr. West's comment, which is what she considered to be "the final straw."  Plaintiff's conduct is hardly that of an individual experiencing intolerable working conditions.

Given these facts, no objective employee would find Plaintiff's working conditions so intolerable as to compel a reasonable person to

ORDER * 15

resign.    Accordingly,  the  Court  dismisses  Plaintiff's  constructive
discharge claim.

### 2.    National Origin and Race Discrimination

Under Title VII, 42 U.S.C. § 1981, and RCW 49.60 et. seq., in the absence  of  direct  discrimination  evidence,  national  origin  and  race discrimination claims are governed by the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). *See Surrell v. Cal Water Serv. Co.*, 518 F.3d 1097, 1105 (9th Cir. 2008) (citations omitted); *Hines v. Todd Pac. Shipyards Corp.*, 127 Wn. App. 356,  370-71  (2005)  ("Washington  courts  have  adopted  the  *McDonnell Douglas/Burdine*  three-part  burden  allocation  framework  for  disparate treatment cases.") (citations omitted).

Under the *McDonnell Douglas* burden-shifting analysis, a plaintiff must first establish a prima facie discrimination case. *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1123 (9th Cir. 2000).  If the plaintiff establishes a prima facie case, the burden of production, but not persuasion, then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the challenged action.  *Id.* at 1124.  If the employer does so, then the plaintiff must show that the employer's proffered reason is merely pretext for a discriminatory motive.  *Llamas v. Butte Cmty. Coll. Dist.*, 238 F.3d 1123, 1126 (9th Cir. 2001).

### i.    Prima Facie Case

Plaintiff  argues  that  Defendant  discriminated  against  her  1)  by denying her the opportunity to sell insurance at the Harman Center, 2) by excluding her from desirable leads, and 3) through Mses. Bloomfield and  Borth's  improper  treatment.  (Ct. Rec. 148 at 10.)  Defendant contends Plaintiff cannot show that either an adverse employment action

ORDER * 16

occurred or similarly situated individuals were treated more favorably. (Ct. Rec. 134 at 15.)

To establish a prima facie discrimination case, a plaintiff must show that 1) she belongs to a protected class; 2) she was qualified for the position; 3) she suffered an adverse employment action; and 4) similarly situated individual outside her protected class were treated more favorably. *Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1062 (9th Cir. 2002) (citations omitted). This showing is minimal and does need not even rise to the level of a preponderance of the evidence. *Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 889 (9th Cir. 1994); *see also Sischo-Nownejad v. Merced Cmty. Coll. Dist.,* 934 F.2d 1104, 1110-11 (9th Cir. 1991) ("The amount [of evidence] that must be produced in order to create a prima facie case is very little.")

The parties appear to agree that Plaintiff belongs to a protected class (Hispanic) and that she was qualified for the position; only elements three (3) and four (4) are disputed.

a.    Element Three - Adverse Employment Action

Defendant argues that an adverse employment action requires a tangible injury, and Plaintiff cannot point to one. (Ct. Rec. 134 at 15.) Plaintiff responds that lost sales opportunities constitute an adverse employment action. (Ct. Rec. 148 at 15.)

The Ninth Circuit takes an expansive view on what constitutes an adverse employment action. *Ray v. Henderson*, 217 F.3d 1234, 1241 (9th Cir. 2000). Examples of adverse employment actions include demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees. *Id.* That said, not every employment decision amounts

to an adverse employment action. *Brooks*, 229 F.3d at 928 (quotation omitted). Courts should avoid "trivial personnel actions" brought by "irritable, chip-on-the-shoulder employees." *Lewis v. City of Chicago,* 496 F.3d 645, 654 (7th Cir. 2007).

Viewing the evidence in Plaintiff's favor, the Court finds that there are three (3) events that, when taken together, could constitute an adverse employment action in a jury's eyes:

The first event is Defendant's failure to abide by its long-standing policy of allocating top leads to top sales agents. (Ct. Rec. 95-8, Ex. 7.) Top leads, or "hot leads," consist of walk-in customers and call-in customers. This makes sense - customers inquiring about insurance on their own volition are more likely to purchase insurance than "cold-calling" individuals in the phone book. Defendant did not follow this policy. Between May and August 2006, Plaintiff was the Yakima office's top sales agent. (Ct. Rec. 136-2 at 10.) Despite her success, Plaintiff did not receive her proportionate share of "hot leads"; instead, other less-successful agents did.

The second event is Ms. Bloomfield's instructions that Plaintiff should handle all Hispanic customers and that she should direct non-Hispanic customers to other agents. (Ct. Rec. 95 at 2.) Defendant goes to great lengths to argue that Plaintiff benefitted from this arrangement because she was the only Spanish-speaking sales agent and therefore received a significant amount of business. (Ct. Rec. 192 at 9.) Not so. Plaintiff testified that Hispanic leads were less likely to turn into actual sales because "Caucasian people . . . know what Medicare will and will not cover. Hispanics tend to think that Medicare is there to take care of you." (Ct. Rec. 194-2 at 18.)

ORDER * 18

The third event is Ms. Bloomfield's instructions that Plaintiff could not travel to the Harman Center - a retirement center "rich" with leads - because the residents were elderly Caucasians and would be "offended by her presence." (Ct. Rec. 95 at 3.)[6]  It is undisputed that

---

[6]Defendant argues that Ms. Bloomfield's statement, which was made to Shawna Young and then relayed to Plaintiff, is inadmissible double-hearsay. (Ct. Rec. 192 at 13.)  Plaintiff counters that Ms. Bloomfield made the statement directly to Plaintiff.  The Court could not locate the support for Plaintiff's position in the record and therefore addresses Defendant's hearsay argument.  In such "double hearsay" situations, each statement must qualify under some exemption or exception to the hearsay rule.  *United States v. Arteaga,* 117 F.3d 388, 396 (9th Cir. 1997).  Ms. Bloomfield's statement to Ms. Young is not hearsay because it is not offered for the truth of the matter asserted (that the elder Caucasian residents would be offended by Plaintiff's presence), but instead to prove Ms. Bloomfield's motive or state of mind - namely why she decided to prohibit Plaintiff from traveling to the Harman Center.  *Peterson v. Tri-County Metro Transp. Dist.*, 2008 U.S. Dist. LEXIS 20881 (D. Or. March 14, 2008).  Ms. Young's statement to Plaintiff is and admissible party opponent admission because the statement concerned matters within the scope of her employment and was made during the existence of the employment relationship.  *See* FED. R. EVID. 801(d)(2)(D); *N. Pac. Ry. v. Herman*, 478 F.2d 1167, 1171 (9th Cir. 1973).  As such, Ms. Bloomfield's remark can be considered for summary judgment purposes.

ORDER * 19

the Harman Center was an important way to make new sales. (Ct. Rec. 95-9 at 125.)

These events conceivably caused Plaintiff to lose sales opportunities. Defendant insists that "lost opportunity" is too intangible to amount to a concrete injury. *See Brown v. Sybase, Inc.*, 287 F. Supp. 2d 1330, 1341 (S.D. Fla. 2003) (finding that inequitable lead distribution to a software salesperson cannot constitute an adverse action where the plaintiff could not show the inequitable distribution resulted in reduced sales). *Brown* is distinguishable on two (2) grounds. First, the plaintiff in *Brown* had no documented right or privilege to top leads; here, Plaintiff was entitled to top leads under Defendant's lead-distribution policy because she was Defendant's top sales agent. Second, the plaintiff in *Brown* had no evidence in the record demonstrating how the inequitable sales distribution impacted his actual sales; here, Dr. Geddes will testify about the tangible sales Plaintiff lost due to Defendant's inequitable lead distribution.

In sum, Defendant's allegedly discriminatory actions, and the adverse impact these discriminatory actions had on Plaintiff's income, is concrete enough to surpass the low threshold for establishing a prima facie discrimination case. *See, e.g., Lewis*, 469 F.3d at 654 (finding that denying a police officer an assignment which could advance her career and result in potentially lucrative future assignments was sufficiently tangible to constitute an adverse employment action).

        b. <u>Element Four - Similarly-Situated Individuals</u>

Defendant insists Plaintiff cannot establish that similarly-situated individuals outside her protected class were treated more favorably because 1) she received both non-Hispanic and "hot leads," and 2) Ms.

ORDER * 20

Bloomfield withheld leads from all Yakima sales agents, irrespective of race or national origin.  (Ct. Rec. 134 at 16.)  Plaintiff does not directly address these arguments.

Individuals are similarly situated when they have similar jobs and display similar conduct.  *Vasquez v. County of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003).

Viewing the evidence in Plaintiff's favor, the Court finds that genuine factual issues exist as to whether Plaintiff was treated less favorably than similarly-situated individuals.  As discussed, Ms. Bloomfield prevented Plaintiff from attending insurance sales seminars at the Harman Center due to her race.  Other Yakima sales agents - Walt Moro, George Pinnell, and Shawna Young - were allowed to attend and obtain sales.  (Ct. Rec. 95-2, Ex. A at 43.)  Plaintiff admits that, after Ms. Bloomfield resigned, it was revealed that Ms. Bloomfield was withholding hundreds of leads from other sales agents.  But Defendant's emphasis on this point is unavailing because, of the leads that were distributed, Plaintiff received a disproportionately lower share considering her status as the Yakima office's top sales agent.  This fact is sufficient to meet the low threshold for establishing a prima facie case.

      ii.  <u>Legitimate, Nondiscriminatory Reason</u>

In step two, the burden shifts to Defendant to demonstrate that it had a legitimate, nondiscriminatory reason for its adverse employment action.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1981).  After review, it appears Defendant did not address this issue.[7]

---

[7]Although Defendant mentions in passing that it had a legitimate,

Therefore, Defendant has not rebutted this presumption, making Plaintiff's national origin/race discrimination claims a question for the jury. *See Vasquez*, 349 F.3d at 641 (finding that if a plaintiff establishes a prima facie discrimination case, courts presume unlawful discrimination). Out of an abundance of caution, however, the Court will proceed with the burden-shifting analysis.

### iii. Pretext

Assuming Defendant articulated a valid reason for its adverse employment action, the presumption of unlawful discrimination "simply drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 511. Plaintiff now bears the burden to demonstrate that Defendant's stated reason for the adverse action was false and that the true reason was unlawful national origin/race discrimination. *Id.* at 507-08; *Lindahl v. Air France*, 930 F.2d 1434, 1437 (9th Cir. 1991). A plaintiff "can show pretext directly, by showing that discrimination more likely motivated the employer, or indirectly, by showing that the employer's explanation is unworthy of credence." *Vasquez*, 349 F.3d at 641.

A plaintiff can establish pretext using three (3) types of evidence: 1) comparative evidence; 2) statistical evidence; or 3) direct discrimination evidence, in the form of discriminatory statements and admission. *Miles v. M.N.C. Corp.*, 750 F.2d 867, 870 (11th Cir. 1985). To avoid summary judgment, a plaintiff "must do more than establish a prima facie case and deny the credibility of the [defendant's]

---

nondiscriminatory reason for its business decision, it does not identify what that reason is. *See* Ct. Rec. 134 at 17.

ORDER * 22

witnesses" - a plaintiff must produce "specific, substantial evidence of pretext." *Wallis*, 26 F.3d at 890.

Viewing the evidence in her favor, the Court finds that Plaintiff has put forth sufficiently specific evidence to establish genuine factual issues regarding pretext. First, Ms. Bloomfield treated similarly situated employees outside Plaintiff's protected class more favorably by permitting all Yakima sales agents but Plaintiff to travel to the Harlan Center. *See Vasquez*, 349 F.3d at 641 (recognizing that a showing that an employer treated similarly situated employees outside the plaintiff's protected class more favorably would be probative of pretext). Second, Ms. Bloomfield's directive that Plaintiff receive all Hispanic leads seems favorable because this theoretically generates ample business. It also shows that Defendant appreciates Plaintiff's bilingual abilities. But Plaintiff testified that Hispanic leads are less valuable than the hot leads she was entitled to but did not receive. Third, Ms. Bloomfield made several improper remarks and engaged in several offensive behaviors during Plaintiff's short employ, e.g., throwing away Plaintiff's floral centerpiece featuring a Mexican flag, remarking that Mexico's president should round up all the Mexicans on his way home, always asking Plaintiff if she was on a personal call when she was conversing on the telephone in Spanish, asking Plaintiff if she was going to march with the other illegal aliens, and implying Mexicans are always late when Plaintiff showed up late for a meeting. These comments shed light on Ms. Bloomfield's discriminatory animus and possibly explain why Plaintiff 1) did not receive top leads, 2) primarily received Hispanic callers, and 3) only received non-Hispanic leads that required extensive travel to follow up on. Taken

ORDER * 23

1   together, there is sufficiently specific and substantial evidence to
2   create genuine factual issues for a jury on pretext.

3              iv.   Conclusion

4       In sum, genuine factual issues on Plaintiff's discrimination claims
5   remain for trial.   The Court's findings are consistent with Ninth
6   Circuit jurisprudence, which requires a plaintiff to produce very little
7   evidence in order to overcome an employer's summary judgment motion
8   because "the ultimate question is one than can only be resolved through
9   a searching inquiry - one that is most appropriately conducted by a
10  factfinder, upon a full record." *Schnidrig v. Columbia Mach., Inc.*, 80
11  F.3d 1406, 1410 (9th Cir. 1996).

12      **3.   Retaliation Claim**

13      Defendant contends that Plaintiff's retaliation claim is properly
14  dismissed because there is no evidence of adverse action after Plaintiff
15  made her discrimination concerns public.   (Ct. Rec. 192 at 22.)
16  Plaintiff insists that being singled out to publicly talk about her
17  discrimination concerns constitutes retaliation.   (Ct. Rec. 148 at 22.)

18      To establish a prima facie retaliation case under Title VII or RCW
19  49.60.210, a plaintiff must demonstrate that: 1) she engaged in a
20  protected activity, such as the filing of a complaint alleging racial
21  discrimination; 2) she suffered an adverse employment action; and 3)
22  there was a causal link between the protected activity and the adverse
23  employment action. *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1094 (9th
24  Cir. 2008); *Harris v. City of Seattle*, 315 F. Supp. 2d 1112, 1125 (W.D.
25  Wash. 2004) (recognizing that Title VII's retaliation standard also
26  applies to RCW 49.60.210).   If the plaintiff establishes a prima facie
    case, the burden of production, but not persuasion, then shifts to the
    ORDER * 24

defendant to articulate some legitimate, nondiscriminatory reason for the challenged action. *Manatt v. Bank of Am.*, 339 F.3d 792, 799 (9th Cir. 2003). If defendant articulates a valid reason, then the plaintiff bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive. *Id.* Only then does a plaintiff's case survive summary judgment. *Brooks*, 229 F.3d at 928.

It appears neither party disputes that Plaintiff engaged in a protected activity when she formally complained to Ms. Borth that Mr. West's Mexican wall comment offended her; the remaining elements are disputed.

In a Title VII retaliation context, an employment action is adverse if it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. Santa Fe. Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotations omitted).

Here, after Plaintiff complained to Ms. Borth about Mr. West's Mexican wall comment, Ms. Borth immediately contacted Ms. Ziegler to report the incident. A few days later (late August or early September 2006), Ms. Borth arranged a conference call with all three (3) sales offices and asked Plaintiff to discuss the incident and how it made her feel. (Ct. Rec. 194-2 at 27.) After doing so, almost everyone on the conference call apologized to Plaintiff for being subjected to the comments and encouraged her "not to let comments like that ruin [her] day." (Ct. Rec. 194-2 at 28.) The words of encouragement from fellow employees made Plaintiff feel "good." *Id.* Ms. Borth then asked if anyone else on the line wished to add anything, prompting an openly-gay sales agent from the Wenatchee office to share a recent discriminatory incident and describe how it made her feel. *Id.*

ORDER * 25

At first glance, these facts do not describe conduct that would dissuade a reasonable worker from making a discrimination charge; to the contrary, such a supportive environment encourages workers to discuss and resolve alleged discriminatory workplace incidents before matters mature into full-scale employment litigation. But emphasis is properly placed on the events leading up to the meeting, not the meeting itself. Defendant's policy requires harassment complaints to be kept confidential. (Ct. Rec. 136-8 at 9.) This did not occur. Instead, Ms. Borth broadcasted Plaintiff's discrimination complaint to all three (3) regional offices. Ms. Borth's actions may have been well intentioned, but this public disclosure, which directly violated company policy, could deter reasonable workers from disclosing sensitive harassment complaints for fear of dislosure. This is a jury question.

### 4. Hostile Work Environment

Defendant asserts that seven (7)[8] isolated, trivial slights are hardly severe and pervasive enough to create an abusive working environment. (Ct. Rec. 192 at 16.) Plaintiff responds that the sheer number of slights make her hostile work environment claim a factual issue for the jury. (Ct. Rec. 148 at 19.)

To make out a hostile work environment claim under Title VII, section 1981, or RCW 49.60.180, a plaintiff must show 1) that she was subjected to verbal or physical conduct based on her race or national origin; 2) that the conduct was unwelcome; and 3) that the conduct was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Vasquez,* 349

---

[8]There are actually nine (9) incidents.

ORDER * 26

F.3d at 642; *Manatt*, 339 F.3d at 797 (recognizing that Title VII's principles apply with equal force to section 1981 actions); *Daly v. Cazier Enters.*, 2006 U.S. Dist. LEXIS 80847 at *7-8 (E.D. Wash. Nov. 6, 2006) (noting that Title VII's hostile work environment standard also applies to RCW 49.60.180).

It appears neither party disputes that Plaintiff was subjected to verbal insults based on her race and national origin and that the conduct was unwelcome;[9] as such, only the third element is disputed.

In order to satisfy the third element, a plaintiff must show that her work environment was both subjectively and objectively hostile. *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1113 (9th Cir. 2004). In making the objective determination, courts look to all of the circumstances, including the frequency, severity, and nature (i.e., physically threatening or humiliating as opposed to merely verbally offensive) of the conduct. *Vasquez*, 349 F.3d at 642. Finally, the environment's objective hostility must be considered "from the perspective of a reasonable person belonging to the racial or ethnic group of the plaintiff." *Id.* at 1115.

Importantly, neither Title VII nor section 1981 are "general civility codes." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (discussing Title VII). "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Id.*

---

[9]At least Defendant does not challenge that certain improper comments were made for summary judgment purposes; Defendant may very well deny some or all of the alleged statements and incidents at trial.

ORDER * 27

Viewing the evidence in Plaintiff's favor, the Court finds that the comments of Ms. Bloomfield and others rise above the "simple teasing" and "offhand comments" category of non-actionable discrimination. As Plaintiff points out, the discriminatory comments started during her new employee training when a co-worker referred to Plaintiff as a "conceited, snotty bitch . . . that . . . probably came from migrant workers and [was] probably picking corn yesterday."

Over the next few months, Ms. Bloomfield - a field sales manager with supervisory authority over Plaintiff[10] - made the following inappropriate remarks and/or took the following inappropriate actions: 1) in reference to Mexican President Vincente Fox's visit to Washington, she commented that President Fox should not be allowed in the United States and that "he should take all the Mexicans that are here back with him"; 2) she instructed Plaintiff to remove a Mexican flag from a floral centerpiece she received at a recent function honoring President Fox because "this is America" - Plaintiff refused; 3) she allegedly threw away Plaintiff's floral centerpiece when Plaintiff was away from her desk; 4) when Plaintiff arrived late to an office meeting, she remarked that "they" [read: Hispanics] are always late; 5) when illegal immigrants staged a labor protest in Yakima, she asked if Plaintiff would be taking the day off to march "with the rest of them [read: illegal immigrants]; 6) she instructed Plaintiff not to attend insurance sales seminars at a Yakima retirement home because Caucasian retirees would "be offended by her presence"; and 7) when Plaintiff conferred in

---

[10]In a separate Order that is forthcoming, the Court addresses why, as a matter of law, Ms. Bloomfield is a supervisor.

ORDER * 28

1  Spanish to Hispanic or Spanish-speaking customers on the telephone,
2  Ms. Bloomfield repeatedly interrupted Plaintiff and asked if she was on
3  a personal call.  Finally, Mr. West commented at a regional insurance
4  conference that he "could not wait for that damn wall to be built and
5  for us to throw all those Mexicans out of here."

6      Defendant tries to paint these events as a "handful of disconnected
7  slights."  Hardly.  Plaintiff testified that Ms. Bloomfield interrupted
8  her phone calls three (3) to four (4) times per week, equating to
9  approximately 60-80 times over the course of Plaintiff's employment.  So
10  although the act of interrupting Plaintiff's telephone calls is not by
11  itself sufficiently severe, the degree of frequency makes it
12  sufficiently pervasive.  *See McGinest*, 360 F.3d at 1113 (noting that a
13  conduct's required severity varies inversely with its pervasiveness and
14  frequency).[11]

15      Indeed, the number and degree of discriminatory comments and
16  actions place this case squarely within the heartland of Ninth Circuit
17  hostile work environment case law.  *Compare Nichols v. Azteca Rest.*
18  *Enters.*, 256 F.3d 864, 872-73 (9th Cir. 2001) (finding a hostile work

19  _____

20      [11]Defendant incorrectly argues that the Ninth Circuit's decision in
21  *Manatt* is on point.  There, a Chinese American endured a racially offense
22  gesture (employees squinting their eyes) coupled with "other offhand
23  remarks" made by co-workers and his supervisor over the course of two-
24  and-a-half years.  339 F.3d at 799.  The Ninth Circuit rejected the
25  plaintiff's hostile work environment claim on those facts.  Here,
26  Plaintiff's short employment period  - just over four (4) months - and
   the sheer volume of comments make *Manatt* easily distinguishable.
   ORDER * 29

environment where a male employee was called "faggot and "fucking female whore" by co-workers and supervisors at least once a week and often several times per day); *Draper v. Coeur Rochester*, 147 F.3d 1104, 1109 (9th Cir. 1998) (finding hostile work environment where plaintiff's supervisor made repeated sexual remarks to her, told her of his sexual fantasies and desire to have sex with her, commented on her physical characteristics, and asked over a loudspeaker if she needed help changing her clothes); *with Vasquez*, 307 F.3d at 893 (finding no hostile environment discrimination claim where the employee was told that he had "a typical Hispanic macho attitude," the he should work in the field because "Hispanics do good in the field," and where he was yelled at in front of others).  This is a question for the jury.

**5.    Punitive Damages**

Defendant insists that punitive damages are not warranted in this case because its inflammatory conduct, if any, was not performed with malice or reckless indifference to Plaintiff's federally protected rights.  (Ct. Rec. 134 at 31.)  Plaintiff submits that this is a jury question.  (Ct. Rec. 148 at 33.)

An employer may be liable for punitive damages in any case where it "discriminates in the face of a perceived risk that its actions will violate federal law."  *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999).  In other words, intentional discrimination is generally enough to establish punitive damages liability.  *Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 515 (9th Cir. 2000).

There are, however, three (3) instances in which intentional discrimination does not give rise to punitive damages liability: 1) if the plaintiff's discrimination theory was sufficiently novel or poorly

ORDER * 30

recognized, the employer could reasonably believe that is actions were legal; 2) the employer could believe it had a valid defense to its discriminatory conduct; and 3) the employer could conceivably be unaware of Title VII's discrimination prohibition. *Id.* The common denominator among each exception is that the employer knew of the discriminatory conduct at issue but nevertheless believed its conduct was lawful.

Viewing the evidence in Plaintiff's favor, the Court finds that a punitive damages award is a factual issue for the jury. Yes, Ms. Borth promptly addressed Plaintiff's formal complaint regarding Mr. West's Mexican wall comment. But Plaintiff previously complained to Ms. Hill about Ms. Bloomfield's improper comments and conduct. On more than one occasion, Ms. Hill advised Plaintiff that even though "she was taking things too personally," she would nevertheless report the incidents to Ms. Borth. (Ct. Rec. 149 at 5, 10.) She did not. Moreover, when Ms. Borth finally heard about one of the offensive comments, she recommended that Plaintiff "needed to grow a tougher skin." (Ct. Rec. 149 at 11.)[12] Given Mses. Hill and Borth's supervisory roles with respect to reporting and managing workplace misconduct in a zero tolerance environment, a jury could find that Defendant discriminated in the face of a perceived risk that its actions would violate federal law. *Kolstad*, 527 U.S. at 536. Summary judgment on this issue is not appropriate.

\\

\\

_____

[12]Ms. Borth disputes making this statement. Considering the statement is admissible as a party opponent admission, it is all the more appropriate for the jury to resolve this credibility dispute.

ORDER * 31

1                                **III. Conclusion**

2     Accordingly, **IT IS HEREBY ORDERED:**

3     1. Defendant's *Daubert* Motion **(Ct. Rec. 138)** is **DENIED**.

4     2. Defendant's Motion for Summary Judgment **(Ct. Rec. 133)** is

5 **GRANTED** (constructive discharge) and **DENIED** (discrimination,

6 retaliation, hostile work environment, and punitive damages) **IN PART.**

7     **IT IS SO ORDERED.** The District Court Executive is directed to

8 enter this Order and to provide copies to counsel.

9     **DATED** this  17th   day of April 2009.

10

11                                s/Edward F. Shea

                                  EDWARD F. SHEA

12                     United States District Judge

13 Q:\Civil\2007\3044.D.MSJ.wpd

14

15

16

17

18

19

20

21

22

23

24

25

26